# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PACIFIC EMPLOYERS INSURANCE COMPANY, | : | CIVIL ACTION |
| Plaintiff, | : | |
| v. | : | No. 09-6055 |
| GLOBAL REINSURANCE CORPORATION OF AMERICA (FORMERLY KNOWN AS CONSTITUTION REINSURANCE CORPORATION), | : | |
| Defendant. | : | |

## MEMORANDUM

**ROBERT F. KELLY, Sr. J.**                                                    **MAY 23, 2011**

      Presently before the Court are a "Motion for Summary Judgment on Count I of Its Counterclaim for Declaratory Judgment" filed by Defendant Global Reinsurance Corporation of America (formerly known as Constitution Reinsurance Corporation ("Constitution")) ("Global"), an Answer and Memorandum of Law in Opposition ("Opposition") filed by Plaintiff Pacific Employers Insurance Company ("PEIC"), and a Reply filed by Global.

      In support of its Opposition, PEIC submitted an Affidavit of Thomas A. Greene ("Greene"), an Expert Report by Greene, and an Affidavit of Judith A. Harnadek ("Harnadek"). Presently before the Court are Global's Motion to Strike certain portions of Harnadek's Affidavit and a Motion to Strike Greene's Affidavit and Expert Report along with memoranda of law in support thereof and PEIC's Responses in Opposition thereto.

## I. FACTS

The claims in this case relate to a reinsurance contract.[1] For the period of June 1, 1980 to June 1, 1981, PEIC entered into a facultative reinsurance contract[2] ("Certificate") with Global, Certificate No. 68224, through which Global, as the reinsurer, agreed to reinsure an umbrella commercial liability policy (No. XMO-003649) ("Direct Policy") that PEIC issued to the Buffalo Forge Company ("Buffalo Forge"). Buffalo Forge purchased primary insurance policies from Utica Mutual Insurance ("Utica Mutual") between June 1, 1961 and June 1, 1981. Utica Mutual issued primary policy (No. GLA 3925) to Buffalo Forge for the period from June 1, 1980 to June 1, 1981. The 1980-1981 Utica Mutual policy has a limit of $1 million.

The dispute in this matter relates to whether PEIC was obligated under the Certificate to provide certain notice to Global in the form of a definitive statement of loss ("DSOL") as a condition precedent to coverage and, if so, whether PEIC breached the condition precedent. The provisions specifically at issue are found on the second page of the Certificate, titled the "Reinsuring Agreements and Conditions." The preamble on this page states:

> In consideration of the payment of the premium, ***and subject to the terms, conditions, and limits of liability set forth herein*** and in the Declarations made a part thereof, the Reinsurer does hereby reinsure the ceding company named in the Declarations (herein called the Company) in respect of the Company's policy(ies) as follows:

---

[1] As described in PEIC's Complaint, "[i]n a reinsurance contract, a reinsurer agrees to indemnify the reinsured against all or part of the loss that the reinsured may sustain under an insurance policy or policies the company has issued, in exchange for a portion of the premium paid to the reinsured for the insurance policies." (Compl. ¶ 7.)

[2] "A 'facultative' reinsurance contract reinsures a specific insurance policy or risk, as opposed to 'treaty' reinsurance, which reinsures multiple insurance policies or an entire book of business written by the reinsured." (Compl. ¶ 8.)

(Compl., Ex. A at 2 (emphasis added).) Following this first sentence, the Certificate outlines conditions A through L, which in relevant part provide:

> D. **As a condition precedent**, the Company shall promptly provide the Reinsurer with a definitive statement of loss on any claim or occurrence reported to the Company and brought under this Certificate which involves a death, serious injury or lawsuit. The Company shall also notify the Reinsurer promptly of any claim or occurrence where the Company has created a loss reserve equal to (50) percent of the Company's retention [$500,000]. While the Reinsurer does not undertake to investigate or defend claims or suits, it shall nevertheless have the right and shall be given the opportunity, with the full cooperation of the Company and its representatives in the defense and control of any claim, suit or proceeding involving this Certificate of Reinsurance.
>
> E. All loss settlements made by the Company provided they are within the terms and conditions of the policy(ies) and within the terms and conditions of this Certificate of Reinsurance shall be binding on the Reinsurer. Upon receipt of a definitive statement of loss, the Reinsurer shall promptly pay its proportion of such loss as set forth in the Declarations. . .

(Id. at ¶¶ D, E (emphasis added).) The Certificate defines the components of a DSOL as:

> . . . those parts or portions of the Company's investigative claim file which in the judgment of the Reinsurer are wholly sufficient for the Reinsurer to establish adequate loss reserves and determine the propensities of any loss reported hereunder.

(Id. at ¶ F, Definitions.)

At some point after the Certificate was executed, Buffalo Forge was named in numerous asbestos products personal injury lawsuits. Buffalo Forge initially tendered these claims to Utica Mutual for defense and indemnity under the primary policies issued by Utica Mutual, including the 1980-1981 Utica Mutual Policy. Buffalo Forge began to give PEIC notice of asbestos personal injury claims and lawsuits by April of 2001. PEIC claims that, although the Buffalo Forge claims did not impact Global's layer of reinsurance until September of 2009, it requested its broker to keep all of its reinsurers informed about the developments in the Buffalo Forge

3

matter throughout its handling of the claim, beginning in October 2005.  PEIC also claims that it sent billings, notices and updates to its broker and asked its broker to forward them to its reinsurers in 2006, 2007 and 2008.  In September of 2009, PEIC submitted its first bill to Global under the Certificate in the amount of $559,072.67.  PEIC explained that, "To date, PEIC has paid a total of $1,915,069 in indemnity and $2,731,294 in defense representing their share of amounts due pursuant to cost-sharing agreements." (Global Mot. Summ. J. Ex. 10 at GLO 001597.)

Global responded to PEIC's September 2009 billing with a reservation of rights letter that included requests for additional information and disputed some areas of coverage.  PEIC provided the additional information and asserted its position that coverage was due under the Certificate.  In early November 2009, Global requested and was granted permission to conduct an audit of PEIC's files.  After conducting a review of the files, Global did not release any funds to PEIC, but instead, informed PEIC that it continued to dispute its liability under the Certificate and was asserting a late notice defense.  On December 18, 2009, PEIC filed a Complaint in this Court alleging a breach of contract and seeking a declaratory judgment of its rights under the Certificate.

Global now moves for summary judgment on its Counterclaim for Declaratory Judgment.  Global's Counterclaim seeks a declaratory judgment that PEIC is not entitled to recover under the Certificate because it failed to promptly provide a DSOL to Global as required by the first sentence of Paragraph D, *supra*.  Global argues that the phrase "As a condition precedent" is a condition precedent to coverage, which PEIC breached by waiting eight years to notify Global of the pending asbestos claims and lawsuits.  As such, Global seeks a declaratory judgment that

"PEIC is not entitled to recover under the [Certificate] for any cession to Global in connection with PEIC's defense and indemnity payments for the underlying asbestos liabilities." (Answer ¶ 60.) At the heart of this case is whether Paragraph D obligated PEIC to promptly provide Global with a DSOL as a condition precedent to coverage and, if so, whether a breach of that condition entitles Global to deny coverage.

## II. STANDARD

Summary judgment is proper when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Our role is to determine "whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). In considering a motion for summary judgment, we do not resolve factual disputes or make credibility determinations and we must view facts and inferences in the light most favorable to the party opposing the motion. Siegel Transfer, Inc. v. Carrier Express, Inc., 54 F.3d 1125, 1127 (3d Cir. 1995). The moving party has the burden of demonstrating that no genuine issue of fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once it has done so, the non-moving party cannot rest on its pleadings, rather, the nonmovant must come forward with facts showing that a genuine issue exists. Anderson, 477 U.S. at 242; Fed. R. Civ. P. 56(e). If the non-moving party fails to produce sufficient evidence in connection with an essential element of a claim for which it has the burden of proof, then the moving party is entitled to summary judgment. Celotex, 477 U.S. at 322-23.

## III. DISCUSSION

### A. Contract Interpretation

The basic rule of contract interpretation is to ascertain and give effect to the intent of the

contracting parties. Murphy v. Duquesne Univ. of the Holy Ghost, 777 A.2d 418, 429 (Pa. 2001). "When the terms of a contract are clear and unambiguous, then the intent of the parties is to be ascertained from the document itself." Ins. Adjustment Bureau, Inc. v. Allstate Ins. Co., 905 A.2d 462, 481 (Pa. 2006). In construing a contract, the court must give effect to all of the provisions therein. An interpretation will not be given to one part of the contract which will annul another part of it. Cepak v. Devito, 767 A.2d 1047, 1050 (Pa. 2001). The issue of whether contractual language is ambiguous is a question of law. Trombetta v. Raymond James Fin. Servs., Inc., 907 A.2d 550, 561 (Pa. Super. Ct. 2006).

Ambiguous writings are interpreted by the fact finder and unambiguous writings are interpreted by the court as a question of law. Mellon Bank, N.A. v. Aetna Bus. Credit, Inc., 619 F.2d 1001, 1011 n.10 (3d Cir. 1994). "A contract will be found ambiguous if, and only if, it is reasonably or fairly susceptible to different constructions and is capable of being understood in more senses than one and is obscure in meaning through indefiniteness of expression or has a double meaning." Metzger v. Clifford Realty Corp., 476 A.2d 1, 5 (Pa. Super. Ct. 1984) (citation omitted).

Global first argues that the first sentence of Paragraph D is unambiguously a "condition precedent to coverage under the Certificate." (Global's Mot. Summ. J. at 15.) PEIC, for its part, argues that it is "at best, ambiguous" and that the DSOL language merely "establishes what must be provided before Global's payment obligation is triggered." (PEIC's Opposition at 5.) PEIC further argues that, due to the ambiguity in the Certificate, we must consider extrinsic evidence presented by it including evidence of trade usage and custom as well as expert and lay testimony. Global counters that we need not look to extrinsic evidence as the Certificate is not ambiguous

6

but that, should we decide the Certificate is ambiguous, its own extrinsic evidence clarifies any ambiguity in its favor.

The first sentence of Paragraph D imposes a duty upon PEIC to "promptly provide the Reinsurer with a [DSOL] on any claim or occurrence reported to the Company and brought under this certificate which involves a death, serious injury or lawsuit." It also declares that such requirement is a "condition precedent." It begs the question - a condition precedent to what? Global argues that it applies to its obligation to provide coverage while PEIC argues that it applies to Global's obligation to promptly remit payment.

We note the language of the preamble, which clearly states that the *reinsurance* is "subject to the terms, *conditions*, and limits of liability set forth herein." (Compl., Ex. A at 2 (emphasis added).) It is undisputed that the preamble encompasses Paragraph D, which states in relevant part:

> As a condition precedent, the Company shall promptly provide the Reinsurer with a [DSOL] on any claim or occurrence reported to the Company and brought under this Certificate which involves a death, serious injury or lawsuit.

(Id. at ¶ D.) When read together, the only reasonable interpretation is that the phrase "As a condition precedent" attaches to coverage and not prompt payment. Furthermore, the purpose of submitting a DSOL is to "establish adequate loss reserves and determine the propensities of any loss reported" under the Certificate. See Id. at ¶ F, Definitions. Logically, Global would require notice of any claims or occurrences as promptly as possible to accomplish this task.

The context of the sentence containing the "condition precedent" language within Paragraph D reinforces our construction that it is a notice condition. The sentence directly following the "condition precedent" language states: "The Company shall also notify the

Reinsurer promptly of any claim or occurrence where the Company has created a loss reserve of fifty (50) percent of the Company's retention. . ." (Compl. Ex. A ¶ D.) In our view, the word "also" means that PEIC had another obligation to provide prompt notice to Global in the event that PEIC created a loss reserve of half of its retention for claims other than those specifically addressed in the first sentence. The last sentence of Paragraph D reserves Global's right to "defend and control any claim, suit or proceeding involving [the] Certificate." (Id.) Were we to adopt PEIC's reading of the Certificate, it would render Global's reserved right to participate in the handling of the claim completely useless as it would not receive notice of the claim until PEIC had already handled it. As a whole, Paragraph D outlines various notice obligations with which PEIC must comply both to receive the benefit of coverage and to allow Global to decide whether to involve itself in the claim. Thus, we find that the first sentence of Paragraph D is a notice condition.

Furthermore, when the overall scheme of the Certificate is considered, we agree with Global that it would be unreasonable to interpret the notice condition as relating to payment. (Global's Reply Br. at 5.) Paragraphs A through C address the establishment of the reinsurance relationship and precedes the existence of a claim that may arise under the Certificate. The Certificate progresses as would a reinsurance claim and, at Paragraph D, describes PEIC's obligations when presented with either a specific type of claim or any claim for which PEIC creates a loss reserve of 50% of its retention. The scope of Paragraph D encompasses PEIC's duties and obligations from the moment it receives notice of a claim, throughout the investigation of the claim and defense of any lawsuit. If PEIC resolves the underlying claim, Paragraph E describes the manner in which the reinsurance billing is presented and paid. PEIC's contention

that the obligation to promptly provide a DSOL outlined in Paragraph D relates only to Global's obligation to provide prompt payment ignores the structure of the Certificate and renders the placement of the first sentence of Paragraph D nonsensical. We decline to read the Certificate as such.

We find PEIC's arguments in opposition to construing the Paragraph D DSOL language as a condition precedent to coverage unpersuasive. First, we find that, by reading the Certificate as a whole, one may reasonably ascertain that the "condition precedent" in Paragraph D is a first notice provision as stated above. The fact that the Certificate's definition of a DSOL does not expressly state that it is a condition precedent to coverage does not undermine its obvious use as such in Paragraph D. Second, PEIC's argument that it is impossible to provide a DSOL when it first receives notice of a claim is meritless. In making this argument, PEIC attempts to assign a different meaning to the term "DSOL" than that specifically prescribed by the Certificate. (PEIC's Opposition at 24 fn. 23.) The Certificate defines a DSOL as "those parts or portions of the Company's investigative claim file which in the judgment of the Reinsurer are wholly sufficient for the Reinsurer to establish adequate loss reserves and determine the propensities of any loss reported hereunder." (Compl., Ex. A at ¶ F, Definitions.) The parties agreed to this definition, and we will not substitute another in its place. Under the definition assigned to a DSOL under the Certificate, we find that it was, in fact, possible to provide a DSOL as defined by the Certificate when PEIC first received notice of the asbestos claims. Lastly, PEIC claims that the phrase "and brought under this Certificate" delays its obligation to provide a DSOL until "the reinsurance layer has attached and the ceding company is seeking reimbursement from the

9

reinsurer."[3] (PEIC's Opposition at 25.) We find that the phrase "and brought under this Certificate" means that which its plain meaning confers upon it, merely those types of claims which fall under Global's reinsurance coverage. Interpreting the phrase "and brought under this Certificate" as PEIC suggests deprives Global of its expressly reserved right to partake in the defense or control of the claim and is, thus, unreasonable. Accordingly, we find that the DSOL language in Paragraph D is unambiguously a condition precedent to coverage.[4]

### B. Conflicts of Law

Federal courts sitting in diversity jurisdiction must apply the law of the forum state, including its choice of law principles. Guinan v. A.I. DuPont Hosp. for Children, 597 F. Supp. 2d 517, 525 (E.D. Pa. 2009) (citations omitted). Pennsylvania courts use a two-step analysis to determine choice of law. Id. A court must first examine whether a conflict exists between the laws of the competing states. Id. "If the court determines that a conflict of laws exists, then the court must analyze the governmental interests underlying the issue to identify the state with the greater interest in the application of its laws." Pyrites Co. v. Century Indem. Co., No. 4514, 2007 WL 5160528 (Pa. Com. Pl. Dec. 12, 2007) (internal citations omitted). In resolving conflict-of-law issues in insurance contract cases, Pennsylvania follows the "flexible conflicts methodology." Id. Under this methodology, the court must apply the law of the state with the most significant contacts or relationships with the particular issue. Id. In applying this process,

---

[3] PEIC cites to extrinsic evidence as authority for this proposition; however, because we find that the Certificate is unambiguous, we will not consider the authority, merely the argument advanced by PEIC.

[4] Since we have determined that the Certificate is unambiguous, we have no need for the affidavits which are the subject of Global's Motions to Strike and we will, therefore, grant them as they relate to testimony going to the intent of the parties.

the court does not simply count the parties' contacts with the competing states; rather, it identifies the jurisdiction with the greater interest by measuring the quality of each contact. Id.

1. The Notice-Prejudice rule in Pennsylvania and New York

Thus far, our analysis has been limited to general contract interpretation and the laws of Pennsylvania and New York have been in accord regarding those basic principles. Finding no true conflict, we have applied the laws of the forum state.[5] Now, having determined that the disputed language unambiguously creates a condition precedent to coverage, we must determine whether a breach of the notice condition would relieve Global of its payment obligation. PEIC argues that Pennsylvania law applies and that, under Pennsylvania law, Global is required to show that it was prejudiced by late notice even where the reinsurance contract expresses a notice provision as a condition precedent.[6] (PEIC Opp. at 35-38.) Global argues that New York law should apply, which does not require a reinsurer to demonstrate prejudice resulting from late notice but that, in any event, Pennsylvania and New York law do not conflict on this point. (Global's Reply at 29-30.)

We begin with an analysis of whether the laws of the two states vary in regards to whether Global is required to prove that it was prejudiced as a result of PEIC's late notice. New

---

[5] This is due to the fact that basic contract interpretation principles do not vary state to state and both sides have admitted that, in deciding previous Motions, there was no need to resolve the conflict of law issue. (Doc. No. 25 at 6, fn. 3.)

[6] We note that, in seeming contradiction to its earlier position, PEIC argues that New York law provides the most useful guidance regarding the interpretation of the notice condition contained in Paragraph D of the Certificate. See e.g., PEIC's Opp. at 8-10 (citing Folksamerica Reinsurance Co. v. Republic Ins. Co., 2003 WL 22852737 (S.D. N.Y. Dec. 2, 2003)) and PEIC's Sur-Reply at 1-3, (citing Pacific Employers Ins. Co. v. White Mountain Reinsurance Co., No. 603009/2088 (N.Y. Sup. Ct. April 6, 2011)).

York law is clear that unless expressly made a condition precedent, failure to provide notice will not excuse reinsurance contract performance absent prejudice. Unigard Sec. Ins. Co. v. North River Ins. Co., 594 N.E.2d 571, 575 (N.Y. 1992). The Second Circuit subsequently recognized that Unigard's prejudice requirement is applicable only to reinsurance contracts that do not set prompt notice as a condition precedent. Constitution Reins. Corp. v. Stonewall Ins. Co., 980 F. Supp. 124 (S.D.N.Y. 1997) (citing Christiana General Ins. Corp. of NY v. Great American Ins. Co., 979 F.2d 268, 273 (2d Cir. 1992)). Both parties agree that this is the law in New York. PEIC argues that Pennsylvania law requires Global to prove that it was prejudiced even in the event that it breached a condition precedent to coverage in order to avoid payment. (PEIC's Opposition at 36.) In support of its argument, PEIC cites to Brakeman v. Potomac Ins. Co., 371 A.2d 193 (Pa. 1977), which, it argues, Pennsylvania later applied to the reinsurance context in Ario v. Underwiting Members of Lloyd's of London Syndicates, 33, 205 and 506, 996 A.2d 588 (Pa. Cmwlth. Ct. 2010).

Brakeman represents a direct and undeniable break from previously decided Pennsylvania cases, which allowed an insurer to deny coverage if its insured breached a notice provision contained in the policy. 371 A.2d at 198. In Brakeman, the insurer relied on the State's previous rulings and argued that it was relieved from its obligation to defend or pay under the policy because the insured had breached a prompt notice provision.[7] Id. The Pennsylvania Supreme Court held that, "where an insurance company seeks to be relieved of its obligations under a liability insurance policy on the ground of late notice, the insurance company will be required to

---

[7] The policy itself contained a prompt notice clause and a clause rendering the insured's compliance with all clauses of the insurance contract a condition precedent to the insured's liability.

12

prove that the notice provision was in fact breached and that the breach resulted in prejudice to its position." Id. at 198. The court required the insurer to prove prejudice for two primary reasons: (1) consumer insurance policies are contracts of adhesion given the relatively low amount of bargaining power held by the consumer and (2) it would be unfair for an insured to forfeit coverage for which it paid in full. Id. at 196-98. Importantly, the court noted, "the function of the notice requirement is simply to prevent the insurer from being prejudiced, not to provide a technical escape hatch by which to deny coverage in the absence of prejudice." Id. at 197.

Because there is no reported decision by the Pennsylvania Supreme Court applying Brakeman to contracts of reinsurance, it is our duty to predict how the Supreme Court of Pennsylvania would decide the issue. See Nationwide Mut. Ins. Co. v. Buffetta, 230 F.3d 634, 637 (3d Cir. 2000). In so doing, a federal court can give due regard, but not conclusive effect, to the decisional law of lower state courts. Id. (citing Burke v. Maassen, 904 F.2d 178, 182 (3d Cir. 1990)). "The opinions of intermediate appellate state courts are 'not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.'" Id. (citing West v. AT&T Co., 311 U.S. 223, 237 (1940)). In predicting how the highest court of the state would resolve the issue, we must consider relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand. British Ins. Co. of Cayman v. Safety Nat'l Cas., 33 F.3d 205 (3d Cir. 2003) (internal quotations and citations omitted).

Pennsylvania case law applying the Brakeman "notice-prejudice" rule to the reinsurance

13

context is exceedingly limited.[8] Our research revealed just one Pennsylvania case from the Commonwealth Court that even briefly addresses the issue. That case is Ario, to which PEIC cites in its Opposition. Ario involved a reinsurer who refused to pay under its policy because it did not receive notice until seven years after the insurer had paid the claim in breach of a notice condition. 996 A.2d at 591. In denying summary judgment to the reinsurer the court held:

> . . . the 'notice-prejudice' rule applies both in Pennsylvania and New York. See Brakeman, 371 A.2d 193 (1977). See also Unigard Sec. Ins. Co. v. North River Ins. Co., 594 N.E.2d 571 (1992). Under this rule, unless the insurer establishes prejudice resulting from the insured's failure to give notice as required under the policy, the insurer cannot avoid its contractual obligation.

Id. at 598 (citing generally Brakeman, 371 A.2d at 198; Unigard, 594 N.E.2d at 573). Because the record was incomplete for purposes of determining whether the reinsurer suffered prejudice, the court denied summary judgment. Id. By citing to Brakeman, the Commonwealth Court introduced the notice-prejudice rule into the reinsurance landscape. However, apart from the brief mention provided above, the Commonwealth Court provided no further discussion.

The Third Circuit has decided whether the notice-prejudice rule applies to contracts of reinsurance, albeit under New Jersey state law. It framed the issue as "whether, under New Jersey Law, a reinsurer must show prejudice in order to prevail on a late notice defense." British Ins. Co. of Cayman v. Safety Nat'l Casualty, 335 F.3d 205, 207 (3d Cir. 2003). Such is precisely the issue currently before us. The Third Circuit acknowledged that New Jersey law only permits

---

[8] However limited Brakeman's application to reinsurance cases, it's notice-prejudice rule is not limited to individual consumer insureds. See Jewelcor, Inc. v. St. Paul Fire and Marine Ins. Co., 499 F. Supp 39, 40 n.1 (M.D. Pa. 1980) (Brakeman would apply in a case involving business interruption loss); Del Boring Tire Serv. v. Fed. Emergency Management Agency, 496 F. Supp. 616, 619 (W.D. Pa. 1980) (Brakeman rule applied in case involving flood insurance); Judge v. Celina Mut. Ins. Co., 449 A.2d 658 (Pa. Super. Ct. 1982) (Brakeman rule applied to case involving fire insurance policy insuring a business).

14

a primary insurer to prevail on a late notice defense if it can show a likelihood of prejudice as a result of the late notice as expressed by that state's Supreme Court in Cooper v. Gov't Ins. Co., 237 A.2d 870, 874 (1968) and Pfizer, Inc. v. Employers Ins. of Wassau, 712 A.2d 634, 644 (1998). Cooper and Pfizer are analogous to Brakeman in this regard. Third Circuit rejected the holding of the District Court below, which determined that the same should not hold true for reinsurance carriers. Id. at 211. The Court of Appeals disagreed with the District Court that the prejudice requirement is necessary to protect consumers from contracts of adhesion, but that those protective principles do not apply to ceding insurers because both parties to a reinsurance contract sophisticated business parties, who are familiar with the reinsurance business and who negotiate at arms-length the terms of the reinsurance contract. Id.

In reversing the District Court, the Third Circuit found that the District Court failed to give due consideration to the role of notice in reinsurance contracts. Id. It described the importance of notice in the primary insurance context as:

> afford[ing] the insurer the opportunity to form an intelligent estimate of its liabilities, to afford it an opportunity to investigate the claim while witnesses and facts are available and to prevent fraud and imposition upon it.

Id. at 213. It went on to note that it is the sole obligation of the ceding insurer to investigate, litigate, settle, or defend claims. Id. at 214. Without the possibility of liability for failing to do that which the primary insurer alone must do, the court deemed the role of notice in the reinsurance context "substantially less important." Id. Furthermore, it noted that, while a contract of reinsurance "does not bear all the indicia of adhesion endemic in contracts of primary coverage," such did "not negate the New Jersey Supreme Court's concern that an insured not forfeit the insurance benefits it has paid for absent sound reasons." Id. at 212-13. Finally, it

15

found that the reinsurer's "right to associate" clause was insufficient to outweigh New Jersey's policy against forfeiture.[9] Id. at 214. We find the Third Circuit's reasoning in British Ins. Co. to be well-reasoned and analogous to the present circumstances.

Based on the foregoing reasons, we predict that the Pennsylvania Supreme Court would hold that a reinsurer must prove prejudice to avoid coverage even where the cedant breached a notice condition that is a condition precedent.

        2.        Whether Pennsylvania or New York law applies

Because there is a true conflict, we must now address the second prong of the choice-of-law analysis and determine which state has the most significant contacts. See Pyrites, 2007 WL 5160528. When dealing with contracts issues in a choice of law analysis, Pennsylvania follows the Restatement of Contracts Second and considers: (1) the place of contracting, (2) the place of negotiating the contract, (3) the place of performance, (4) the location of the subject matter of the contract, and (5) the domicile, residence, nationality and place of business of the parties. Ario, 996 A.2d at 595 (citing Gillan v. Gillan, 345 A.2d 742, 744 n.1 (Pa. Super. 1975)). The Pennsylvania choice of law analysis takes into account the interests and policies that may be asserted by each jurisdiction. Hammersmith v. TIG Ins. Co., 480 F.3d 220, 235 (3d Cir. 2007).

As a preliminary matter, we note that the Certificate does not contain an express choice of law provision and there is no other indication from the text of the Certificate that the parties implicitly agreed that any state's law should apply. See Hammersmith, 480 F.3d at 233 (citing Assicurazioni Generali S.P.A. v. Clover, 195 F.3d 161 (3d Cir. 1999)) (noting that parties can

---

[9] "A 'right to associate' is the right of the reinsurer to consult with and advise the reinsured in its handling of the claim." 335 F.3d at 214.

16

sometimes be found to have implicitly agreed to be bound by one state's laws where the contract frequently references the laws of that state).

We begin the Restatement (Second) Contracts analysis by considering which state, if any, has more significant contacts regarding the place of contracting. Accepting all facts in the light most favorable to the non-movant, we adopt PEIC's account of the formation of the Certificate. Both parties acted through a broker located in Minneapolis, Minnesota. In May 1980, PEIC's Minnesota broker forwarded to reinsurers PEIC's underwriting analysis and indication of premium for the various layers of policy and requested, via cable, reinsurers' participation on the facultative program to bind effective June 1, 1980 (at the same time as the PEIC policy). The broker simply advised Constitution (and other potential reinsurers) of the term, limits, and premium for the various layers of the PEIC policy and each reinsurer indicated an agreement to bind if it was interested. By cable dated June 5, 1980, Constitution confirmed its agreement to participate for 25% of the $4 million excess $1 million layer of the PEIC policy. Thus, the place of contract formation was New York. PEIC concedes that such is arguably the case.

However, neither state has more significant contacts with the negotiating of the Certificate. PEIC asserts that "There was no negotiation of any of the reinsurance terms and conditions listed on the back of the reinsurer's certificate forms." (PEIC's Opposition at 12.) There is some dispute over PEIC's refusal to pay premiums until it received the Certificate from Constitution constitutes negotiations but there is no evidence that this delay constituted "negotiations" as there was no discussion relating to the terms of the Certificate or to premiums. This is evidenced by the fact that the terms accepted by Constitution via cable on June 5, 1980 are identical to those contained in the Certificate. Furthermore, PEIC admits that the actual

17

receipt of the Certificate is relatively immaterial given that the Parties understood there was an "agreement to bind" already in place. (PEIC's Opposition at 12, n.9.)

The Parties disagree over which state is properly the "place of performance" regarding the third factor. We must apply Pennsylvania's conflicts of law principles. Guinan, 597 F. Supp. 2d at 525. In Pennsylvania, the place where the cedent receives payment is deemed the place of performance. See Ario, 996 A.2d 596; accord Lucas Enterprises, Inc. v. Paul C. Harman Co., Inc., 417 A.2d 720, 721-22 (Pa. Super. 1980) (place of performance is place where payment is due). PEIC argues that the place of performance is Pennsylvania because payment will be received in Pennsylvania. (Id. at 37, n.39) (citing Ario, 996 A.2d at 596). Global contends that the place of performance is New York because if performance is required under the Certificate, it will initiate a wire transfer from its New York office. (Global's Reply at 30, n. 18) (citing Constitution Reins. Corp. v. Stonewall Ins. Co., 980 F. Supp. 124, 127 (S.D.N.Y. 1997)). Here, payment was to be received in Pennsylvania. Accordingly, Pennsylvania has greater contacts with the place of performance.

Pennsylvania also has the most significant contacts with the subject matter of the Certificate. In a reinsurance contract, a reinsurer agrees to indemnify the reinsured against all or part of the loss that the reinsured may sustain under an insurance policy or policies the company has issued, in exchange for a portion of the premium paid to the reinsured for the insurance policies." (Compl. ¶ 7.) Thus, the subject matter of the Certificate is PEIC's risk. Although the underlying PEIC policy was with Buffalo Forge in New York, we are not persuaded that this is a significant factor because there was no relationship between Constitution and Buffalo Forge. Specifically, the Certificate does not give Constitution any rights relating to Buffalo Forge and it

similarly does not impose any obligations on Constitution in regards to Buffalo Forge.

Regarding the domicile of the Parties, PEIC is a Pennsylvania corporation domiciled in Pennsylvania and Constitution was a New York corporation domiciled in New York.

Finally, we must consider the interests and policies that may be asserted by each jurisdiction. New York has an interest in regulating reinsurance contracts entered into by its reinsurers. Pennsylvania has an interest in ensuring that its ceding companies receive coverage for which they have paid in full. Furthermore, Pennsylvania has an interest in achieving uniformity in a situation where the ceding company has ceded portions of its risk to various reinsurers. One Pennsylvania court has deemed the uniformity interest best served by applying the law of the ceding company's locale. See, Ario, 996 A.2d at 597 ("[c]ertainty, predictability and uniformity in the result of reinsurance contract actions is best served by turning to the cedent's locale."). In contrast, New York's interest in the application of its laws to the instant matter is relatively low. Thus, we will apply Pennsylvania law to the remaining issues.

### 3. Whether Global can succeed under Pennsylvania law

The rule announced in Brakeman is that the insurer must not only prove the notice condition was breached but also that it suffered prejudice as a consequence. 371 A.2d at 196. Global can not succeed under Pennsylvania law because it has failed to allege facts to support a finding of prejudice. To the contrary, Global represented to this Court in earlier proceedings that it intended to drop its prejudice argument and that it need not prove prejudice.[10] Additionally,

---

[10] Whether Global had dropped its prejudice argument was the subject of a Motion to Strike submitted by PEIC. We granted the Motion to Strike because Global would not comply with discovery relating to prejudice and because it represented to us in its Opposition that it was, in fact, dropping that defense.

Global continues to assert that it need not prove prejudice.  Pennsylvania law does not favor forfeiture of coverage for a technical breach, absent a sound reason for doing so.  Id. at 197.  We have predicted that Pennsylvania would apply the same principles to reinsurance contracts.  However, Global does not allege a "sound reason" to be relieved from its coverage obligations.  Accordingly, Global cannot avoid coverage for a technical breach.  To permit Global to prevail on this Motion would contravene Pennsylvania's policy against "technical escape-hatches" by which to deny coverage in the absence of prejudice.  See Id.  Accordingly, we deny summary judgment.

## IV. CONCLUSION

We find that the Certificate contained a notice condition precedent to coverage but that Pennsylvania law applies and prohibits Global from denying coverage on the basis of late notice absent a showing of prejudice.  Because Global has not introduced any evidence that it was prejudiced as a result of PEIC's late notice, we deny Global's Motion for Summary Judgment.